**Olen Maffet POUND d/b/a Coles Point Marina, Plaintiff,**

v.

**THE UNITED STATES, Defendant.**

No. 94–496C.

United States Court of Federal Claims.

Feb. 26, 2002.

James E. Moore, Niceville, Florida, for plaintiff.

E. Michael Chiaparas, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, for the United States. With him were Robert D. McCallum, Jr., Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director. G. Rogers Sloan, Attorney, Office of Counsel, Vicksburg District, Corps of Engineers, of counsel.

## OPINION

BRUGGINK, Judge.

This is an action brought under the Contract Disputes Act, 41 U.S.C. §§ 601–613 (1994). It concerns the lease of a lakeshore marina in Mississippi to plaintiff by the U.S. Army Corps of Engineers (the "Corps"). In an earlier opinion filed January 14, 2000, the court dismissed two counts of the complaint, the first alleging that there was no basis for termination, the second that there was an oral agreement to permit transfer of the lease. With respect to the remaining contract count, we held that the Corps breached the lease by terminating without adequate notice to plaintiff to quit the premises and that plaintiff was entitled to recover the value of items of personalty or fixtures which could have been removed on adequate notice. We also held, however, that defendant had grounds for terminating the lease, and that the lease made plaintiff responsible for maintaining the premises in a safe and clean condition. We found that plaintiff's failure to comply with those obligations prompted the Corps to enter the premises and clean up storm damage and make other necessary repairs, for which it was entitled to reimbursement. In addition, the court found that plaintiff was liable for the Corps' costs in restoring the premises. Accordingly, the court allowed the counterclaim to the extent of costs associated with the 1991 cleanup and the 1992 restoration, but not with respect to removal of plaintiff's own property, to the extent it could have been removed on proper notice.

After trial, which was conducted in Vicksburg, Mississippi, from February 12–14, 2002, the court concludes that the value of personalty and fixtures which plaintiff could have removed on adequate notice was $2050, but that the government is entitled to an offset on its counterclaim in the amount of $132,806.86.

## DISCUSSION

The parties entered into an extensive stipulation of background facts, which will not be repeated here. Familiarity is also assumed with the facts set out in the opinion of January 14, 2000. Trial was limited to the remaining issues in dispute—the value of plaintiff's property and the reasonableness of the costs asserted by the government.[1]

---

1. Plaintiff listed two witnesses in his pretrial submission: himself and an appraiser, Bryan W.

Pray. During trial, plaintiff made the decision, without objection from the government, to rely,

*Plaintiff's Claim*

■ Section 1 of the lease gave the Corps the right to terminate the lease and demand repossession on giving plaintiff sixty days' notice to vacate. We found earlier that a final rejection of plaintiff's offers to negotiate a transfer of the lease, and a final demand for vacating the premises, did not occur until February 25, 1992. To the extent that defendant removed or destroyed plaintiff's property before April 26, or did not permit him to remove it before that date, it did so at its own risk. Neither party put on evidence at trial directly bearing on this issue. It is thus not clear whether plaintiff either would have been permitted to remove, or physically could have removed, any of the fixtures or, for that matter, was even interested in removing them before April 26. We view the question of prejudice, or lack of it, as part of defendant's burden, however.

In any event, even though five of the cabins and the restaurant were not removed until the end of 1992 (and the house is still on the premises) we think it is clear that, at some point in the spring of 1992, the Corps elected to quit waiting for plaintiff to remove the fixtures and began making its own arrangements. As J. Frank Walker, the Corps Vicksburg District Resource Manager in 1992, testified, at some point early in 1992, plaintiff and his represents were barred from removing utilities from the house. Apparently, the Corps made the decision at that time not to permit plaintiff to remove the residence.

Plaintiff claims damages in connection with respect to four types of property: five rental cabins; the restaurant; the house; and equipment ancillary to the house and trailer pads. The house and the cabins were all present when plaintiff acquired the leasehold from his predecessor in 1970. In his deposition, Mr. Pound characterized these cabins as "run down" even in 1970. Over time, he replaced the roofs once, put in kitchens, and replaced the linoleum floors once. The condition of the residence he characterized as "fair." The trailer pad hookups and septic

tanks he installed shortly after he arrived at a cost of between four and six hundred dollars per trailer. The restaurant he built himself in the early 1980s. He characterized its condition in 1989 as "good." It included a septic tank. It had settled, however, and had leakage problems which he attempted to fix. Mr. Pound replaced the well house servicing the residence and trailers and put in a new water tank. Apparently, none of the buildings were built to local codes. In the mid–1980s, Mr. Pound installed a marina with boat slips, fueling facilities, and a store.

To support his assessment of value, Mr. Pound offered the appraisal and testimony of Bryan W. Pray, a certified Mississippi appraiser. In 1992, Mr. Pray had done an appraisal of the value of plaintiff's leasehold interest as a going concern as of 1990. In the process of completing that appraisal he projected an income stream from the facility in place, but also generated replacement cost data. In light of the court's prior ruling, he updated his appraisal in 2001, using cost data he had previously generated. His valuations, however, were all of the property *in place*, i.e., as if they were still being used at the Coles Point site. The court's direction, however, was to value the property as if it had to be removed offsite. This comported with the breach found, namely, that the Corps had not allowed sufficient time to plaintiff to remove his improvements or personalty. Mr. Pray's appraisal, consequently, is of limited value to the court.

Another characteristic of Mr. Pray's appraisal limits its utility: the effective date. The updated appraisal uses the same January 1990 effective date as the 1992 appraisal. The court's opinion, however, directed that the breach occurred in spring 1992, when the Corps cut off plaintiff's right to recover his property either by selling it, destroying it, or, in the case of the house, prohibiting access by plaintiff. The relevant time for determining value, in other words, is the time of the breach, spring 1992.

Mr. Pray attempted to determine market value using local cost data for replacing a

in lieu of his own live testimony, on his June 28, 2001 deposition, which was made an exhibit to

the trial record.

dwelling, on a square foot basis. He then applied an estimated depreciation factor, using his own best judgment. With respect to the cabins, he applied a 40 or 50 percent factor. As to the house, he applied a 10 percent depreciation factor. For the restaurant, which he felt had an effective age of ten years, he used a 12 percent depreciation factor. Using this methodology, he arrived at values of approximately $10,000 per cabin, including the cabin destroyed by the Corps in 1991 (because it was considered unsafe due to flood damage), $43,500 for the residence, and nearly $65,000 for the restaurant. He used a similar methodology to arrive at values for the well,[2] fuel tanks, and trailer pads, except that he assigned no depreciation. As to these last three items, he assigned a value of $29,000. The total value he derived was slightly over $207,000.

On cross-examination, Mr. Pray conceded that the value of the property, if it had to be moved off site, should reflect the costs both to move and reassemble. He did not include these adjustments in his calculations, although he estimated at trial a total cost of approximately $15,000.

One consideration offered by the government is the fact that the Corps of Engineers would have to approve the cutting of any trees that had to be removed in order to move the buildings. The suggestion apparently being that, if the Corps did not approve the tree removal, plaintiff might not have been able to access the buildings in order to move them. Fortunately, both appraisers did their calculations based on the assumption that the Corps would not have opposed some minimal tree removal. If it had, of course, plaintiff could have made the argument that this would be tantamount to taking possession of the improvements. The court similarly assumes that the Corps would have permitted the minimum amount of tree removal necessary to lift the buildings off their foundations, although not that it would have permitted a wholesale cutting of trees along

the access road for the sole purpose of moving the house in one piece. The latter would have gained plaintiff little, according to John Williams, a professional house mover called by the government as a witness. He explained that cutting the house into two pieces would have been more practical in order to move it more readily on state highways.

The government offered the testimony of Marion K. White, a certified Mississippi appraiser. Unlike Mr. Pray, he correctly viewed his assignment as valuing the property as if it was to be removed from Coles Point. For this reason, he explained, a traditional approach to an appraisal, such as that employed by Mr. Pray, was inappropriate. Instead, he used a market approach geared exclusively to sales of buildings to be moved. Although he did his current valuation in 2001, Mr. White had visited the site previously in September, 1991. At that time, all the buildings were still on site, although the Corps was in the process of tearing Cabin No. 1 down.[3]

As part of that visit, he did an assessment of the condition of the buildings. His description of Cabin No. 2 is typical:

> Cabin Number 2 is a one-story, wood frame structure with on-slab and pier foundation. The unit contains 808 square feet. The exterior condition of the wood frame cabin is extremely poor. Rot and termite damage is evident. The windows are mostly wood frame and are in need of replacement due to deterioration. The interior is also in extremely poor condition, including the small bathroom. This cabin has low-ceiling sheetrock construction that is not typical of residential construction. The overall condition of this cabin is so poor that, in my opinion, the repair costs would exceed the cost of replacing the entire unit.

He concluded at that time that the cabins and the restaurant had zero salvage value.

---

2. He incorrectly assumed that the well should be appraised as a functioning utility, in place.

3. We agree with the government that no value should be assigned to Cabin No. 1. The Corps tore it down because it was irreparably damaged as a result of flooding. The Corps thus had the

contractual right to tear down the cabin when it became apparent that plaintiff would not take care of the problem. In any event, the cabin was demolished before the end of 1991; thus, it was not present at the valuation date.

The house, pump, and water tank, he concluded, had a salvage value of $650.

The government also offered the testimony of Melvin H. Chaney, Jr., a certified appraiser. His testimony was primarily useful in sponsoring the valuation of Mr. Williams, whom he knew to be an expert at moving buildings. Mr. Chaney concluded, in doing the appraisal, that a traditional, in-place appraisal was inappropriate [4] and that the task put to him was to derive, in effect, a market figure for the salvage value of the buildings and fixtures. We agree. For that reason, he asked Mr. Williams to estimate the amount likely to be recovered if the buildings and other improvements were offered for competitive sale to someone who would have to move them from Coles Point. The court finds that Mr. Williams was particularly well suited to making such a value assessment. He has long experience, not only in moving buildings, which would give him information on moving and reassembling costs, but also in buying and selling buildings to be moved. He has purchased, competitively, the right to remove houses and other buildings, and then resold them. He has made such purchases from the State of Mississippi and from private sellers.[5]

In order to make his determination, Mr. Williams visited the site. Because the buildings other than the house had already been removed or destroyed at that point, he had to base his assessment in part on photographs of the other buildings. He described the cabins as being in "very poor condition" and having no market value to be removed. The restaurant was also in poor condition, in his view, and had other problems. Because it was a commercial building, which in itself limited its marketability, it would have to be audited and certified as creating no environmental hazards. He assigned it no market value. The house, he felt, had some value. Assuming, correctly, that plaintiff was responsible for site cleanup, he gave it a value of $1,000. Mr. Williams also explained that the highest price he had ever heard of being paid for the right to buy and move a house was $5000.

Mr. Chaney also consulted with others he considered knowledgeable about the value of the water tank, fuel tanks, and trailer pad hookups. He assigned a depreciated, removed value of $1050 to all of these items. Although the value of the house and these other items totaled $2050, Mr. Chaney gave no value to the house in his summary figure on the assumption that everything had to be sold as a package and removed. Because the removal costs of the cabins and restaurant were in excess of value, he came to the conclusion that everything together was worth no more than $1050.

Perhaps the best support for the government's assessment of value is the fact that the restaurant and six cabins were publicly offered for purchase and removal. The solicitation was advertised, yet only one individual made an offer. Jessie Dukes paid $225 for the right to remove the restaurant and two of the cabins. No one made an offer on the three remaining cabins. Even then Mr. Dukes ultimately never removed the restaurant and the Corps was left with the job of dismantling and removing it.

Nor do we believe the March 1992 date is inappropriate because of prior vandalism. Plaintiff had been invited many times to remove the buildings before the government cut off his opportunity to do so. In addition, his son lived on the premises over a year after the lease was terminated. As Mr. Cha-

---

4. We are not troubled by the fact that this was a "restricted" appraisal, i.e., that it was intended for client use only. There is nothing in the Standards of Professional Appraisal Practice of the Appraisal Institute that precludes use of a restricted appraisal in court. What is relevant is that the restrictions in terms of methodology and use were explained.

5. Plaintiff argued during trial that such sales would not reflect true market value because they involved a seller who was under compulsion to move the building. According to Mr. Williams, some of his prior experience did involve "voluntary" sales. The court finds that his other experience is nonetheless relevant. The desire of a developer or a government entity would still be to obtain maximum value under circumstances comparable to those in which plaintiff found himself. A buyer was simply paying for the value of the building, not as a going concern, but for whatever it was worth removed from the site, in light of costs of removal, cleanup, and relocation.

ney testified, even in 1991, when he first saw the buildings, they were already in a seriously deteriorated condition.

The court has seen the photographs and videotapes showing the condition of the buildings. It has heard the testimony of eyewitnesses. Even if it were modified by relocation and cleanup costs, Mr. Pray's approach to value seems wholly unrealistic. This was a salvage operation at best. It could not be meaningfully treated as a typical real estate appraisal. We conclude that the reports of Messrs. Chaney and Williams are credible. Because the buildings could have been sold separately, we assign a total value of $2050 for all buildings and fixtures. Plaintiff is entitled to a credit in that amount.

*The Government's Claim*

 We ruled earlier that the lease gave the Corps of Engineers the right to reimbursement for cleanup and restoration expenses. The costs claimed fall into those two categories—cleanup and restoration.

Cleanup costs primarily involved undoing the damage done by two different moveable breakwaters plaintiff installed in order to protect his marina. The first consisted of hundreds of tires, anchored in the water, but suspended by styrofoam. There was considerable testimony and several exhibits which made it clear that the tire breakwater disintegrated over time, primarily because of flooding. The effect was that it lost its structural integrity and the tires floated into the navigable portions of the lake. Many sank when the level of the lake dropped. The court has seen the video tapes and still photography showing the Corps' extensive cleanup efforts. It has also reviewed the documentary record of the Corps' unsuccessful efforts to get plaintiff to clean up the tires himself. The court is persuaded that the tires were a serious navigation hazard and eyesore. When plaintiff failed to remove the tires, it was the Corps' right under the contract to remove them itself and assess him with the costs.

Virtually the same pattern occurred with respect to the wooden breakwater plaintiff later installed to replace the tires. Flooding broke up the structure, sending pieces out into the main body of the lake. Plaintiff never cleaned up the mess and the Corps is entitled to be reimbursed for its considerable efforts to do so. Both the tires and the other breakwater debris had to be removed at great effort from the lake and then transported and cleaned before they could be legally disposed of. The latter was done by outside contractors.

The Corps also absorbed expenses in connection with repositioning the marina and putting up barriers to keep the public out of restricted areas of Coles Point or the lake. Portions of the marina had broken free or were submerged. These had to be removed onto the shore. In addition, concerns about the safety of the water furnished to the trailers by the on-site well prompted testing and minor repairs to the well in 1991.

There are two items of cleanup or restoration that the court concludes are not recoverable. The first is the cost of removing grills and picnic tables. These were installed by the Corps and had deteriorated due to time and flooding. When the Corps removed the tables, some were apparently reused elsewhere. Like the restroom facilities, these could have been replaced by the Corps without consulting plaintiff. Nothing in the lease explicitly made plaintiff responsible for maintaining or replacing them.

The second item is the removal of the small catfish pond plaintiff had installed, apparently with the Corps' permission at a time when it was not viewed as a hazard. There was no evidence that plaintiff had been instructed to remove it.

We agree with defendant that the administrative costs associated with cleanup and restoration are recoverable. That is not true, however, with respect to the costs associated with obtaining a new tenant. These are not recoverable under the lease. They would be associated with any termination. In sum, the government is entitled to recover $132,806.86 ($82,632.98 for the Sardis division and $50,173.88 attributable to the real estate division).

## CONCLUSION

The government is liable to plaintiff for contract damages in the amount of $2050.

**718**

The government is entitled to recover costs and other expenses in connection with the cleanup and recovery in the amount of $132,806.86. When offset against plaintiff's recovery, the government is entitled to a net judgment in the amount of $130,756.86. Judgment accordingly. No costs.